DOWD, J.

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| Moses Moore, et al., | ) | |
| | ) | CASE NO. 5:03 CV 1342 |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | <u>MEMORANDUM OPINION</u> |
| | ) | <u>AND ORDER</u> |
| Rohm & Haas, et al., | ) | (Resolving Documents 162, 169 and 182) |
| | ) | |
| Defendants. | ) | |
| | ) | |

Plaintiffs filed their fourth amended complaint on May 21, 2007, pursuant to

Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185(a), and

Sections 502(a)(1)(B) and (a)(3) of the Employment Retirment Income Security Act of 1974

("ERISA"), 29 U.S.C. §§ 1132(a)(1)(B) and (a)(3) (Document 123).  On behalf of themselves

and others similarly situated, plaintiffs seek the following relief: 1) a declaration that defendants

Rohm & Haas and its wholly owned subsidiary, Morton International (dba Morton Salt,

collectively "Morton"), have violated their obligations under the Morton Retired Employees

Group Insurance Plan ("Plan")[1] and labor agreements under which class members were to

receive retiree medical benefits by unilaterally reducing those benefits; 2) an order that Morton

perform its statutory and contractual obligations under the Plan and labor agreements by

reinstating full medical benefits coverage and prohibiting future reduction or termination of

coverage; and

---

[1] Morton Retired Employees Group Insurance Plan is also a defendant in this action who was sued as "a party needed for just adjudication under Rule 19 of the Federal Rules of Civil Procedure."  *See* Plaintiffs' Fourth Amended Complaint, par. 7.

(5:03 CV 1342)

3) an award of monetary damages to class members to restore them to the position they would have been in had Morton not unilaterally reduced their benefits.[2]

Currently pending before the Court are the parties' cross motions for summary judgment.[3]  Plaintiffs filed supplemental submissions in support of their motion for summary judgment (Documents 193 and 198) to which defendants responded (Documents 195 and 199).

For the reasons discussed below, plaintiffs' motion for summary judgment (Document 169) with respect to Subclass A and B plaintiffs is granted as to liability and denied as to damages.  Plaintiffs' motion for summary judgment (Document 169) with respect to Subclass C plaintiffs is: a)  granted to the extent that Subclass C plaintiffs are vested in their retiree health benefits; b) denied to the extent that defendants violated the applicable collective bargaining agreements since 2006 by not reducing the "actual cost of retiree medical insurance" by the full amount of defendants' Medicare D subsidy; and c) denied as to damages.

For the reasons discussed below, defendants' motion for summary judgment (Document 162) with respect to Subclass A and B plaintiffs is denied.  Defendants' motion for summary judgment (Document 162) with respect to Subclass C plaintiffs is: a) denied to the extent that Subclass C plaintiffs are not vested in their retiree health benefits; b) granted to the extent that defendants did not violate the applicable collective bargaining agreements since 2006 by not

---

[2] Plaintiffs' prayer also seeks class certification.  The Court previously granted plaintiffs' motion for class certification and defined the class.  *See*, Document 155.  Plaintiffs' prayer also requests attorney fees and costs, which are not yet before the Court.

[3] Plaintiffs' motion for summary judgment (Documents 169 and 170), defendants' opposition (Document 178), and plaintiffs' reply (Document 181).  Defendants' motion for summary judgment (Documents 162 and 168), plaintiffs' opposition (Document 175), and defendants' reply (Document 180).

(5:03 CV 1342)

reducing the "actual cost of retiree medical insurance" by the full amount of defendants'

Medicare D subsidy; and c) denied as to damages.

Also before the Court is defendants' motion to strike a portion of the reply brief filed by

plaintiffs' in support of their motion for summary judgment (Document 182), and plaintiffs'

response to defendants' motion to strike (Document 183).  Because the Court's ruling on the

Subclass C plaintiffs' claim regarding the Medicare D subsidy was based on the contract

language, defendants's motion to strike (Document 182) is denied as moot.

## I.  BACKGROUND

Plaintiffs are retired employees, or surviving spouses of deceased retired employees, of

Morton Salt.  The retired employees worked at various Morton Salt plants in different states,[4]

under different collective bargaining agreements negotiated by different unions,[5] and retired at

different times.[6]  Retiree medical benefits were the subject of collective bargaining between

Morton Salt and the unions representing the retirees while they were Morton Salt employees.

---

[4] Fairport and Rittman, Ohio; Manistee and Marysville, Michigan; Hutchinson, Kansas; Weeks Island, Louisiana; Silver Springs, New York; Grand Saline, Texas.

[5] There were three local unions of the United Steelworkers of American, AFL-CIO-CLC ("USWA"): 1) Rittman, Ohio (USWA Local 12081); 2) Hutchinson, Kansas (USWA Local 12606); 3) Marysville, Michigan (USWA Local 12778).
There were three local unions of the Paper, Allied-Industrial, Chemical & Energy Workers International Union, AFL-CIO-CLC ("PACE"): 1) Fairport, Ohio (PACE Local 5-966); 2) Manistee, Michigan (PACE Local 6-667); 3) Silver Springs, New York (PACE Local 1-625).
There were two local unions of the International Chemical Workers Unions Council of the United Food & Commercial Workers ("ICWUC"): 1) Grand Saline, Texas (ICWUC Local 3C); Weeks Island, Louisisana (ICWUC Local 29C).

[6] Retirement dates of the named plaintiffs range from as early as January 1, 1984 (the spouse of Laura Bialik who worked at the Manistee, Michigan plant), to as late as June 1, 2002 (Moses Moore who worked at the Rittman, Ohio plant).

3

(5:03 CV 1342)

In 2002 and 2003, Morton Salt implemented changes to retiree medical benefits that increased costs to retirees.  Plaintiffs allege that the changes in retiree medical benefits violate the sections of the LMRA and ERISA previously identified.

The Court previously dismissed without prejudice the LMRA claim in Count XIII and the ERISA claim in Count XIV of plaintiffs' fourth amended complaint.  *See*,  Document 155.  These two counts related to the Elk Grove Village facility in Illinois.  Plaintiff Amelia Jones was identified in the Fourth Amended Complaint as the surviving spouse of a retired employee of that plant (Document 123, par. 22).  Counts XIII and XIV were dismissed because plaintiffs did not include Ms. Jones among the representatives of any of their three proposed subclasses.  Further, defendant made the unrefuted argument that the Elk Grove Village facility was not a salt plant, as are all the other plants.

A.    CLASS CERTIFICATION

The Court previously certified a Rule 23(b)(2) class with three subclasses as described in its Memorandum Opinion and Order (Document 155).  Subclass A consists of employees who retired from Morton Salt at a time s/he was required to pay no premium for retiree health benefits according to the collective bargaining in effect at the time of retirement.[7]  Subclass B consists of employees who retired from Morton Salt at a time s/he was required to pay a fixed monthly premium or percentage of the total cost of retiree health insurance for retiree health benefits according to the collective bargaining in effect at the time of retirement.[8]  Subclass C consists of

---

[7] Generally, Subclass A includes employees who retired on or before April 1, 1989.

[8] Generally, Subclass B includes employees who retired between  April 2, 1989 and January 1, 1993.

4

(5:03 CV 1342)

employees who retired from Morton Salt at a time s/he was subject to a cap of Morton Salt's

contributions to retiree health benefits according to the collective bargaining in effect at the time

of retirement.[9]  The language of the collective bargaining agreements for each subclass is

identical or very nearly identical.  *Id.*

B.      SUBCLASS C

In this subclass, the bargaining agreement language provides for retiree health benefits

that are paid for by both the retirees and the defendants.  The defendants' contribution to these

benefits is "capped" and the difference between the "actual cost of retiree medical insurance"

and the defendants' capped contribution is the cost to the Subclass C plaintiffs.

The Medicare Modernization Act of 2006 established Medicare Part D, which provided

prescription drug coverage for medicare recipients.[10]  The Act provided employers with a

subsidy of up to 28% of allowable prescription drug costs  "[t]o encourage employers to

maintain existing retiree drug coverage programs."[11]  Defendants have previously "gratuitously"

applied 50% of the Medicare D subsidy to reduce the "actual cost" of retiree medical coverage.[12]

The dispute between the parties with respect to Subclass C is whether the contracts require

defendants to credit any or all of the entire amount of the of the Medicare D subsidy to "actual

costs."

---

[9] Generally, Subclass C includes employees who retired on or after January 2, 1993.

[10] Pub. L. 108-173-117, Stat. 2066.

[11] Brief in Support of Plaintiffs' Motion for Summary Judgment, Docket No. 170, p. 24 of 46.

[12] Defendants' Brief in Support of Summary Judgment, p. 44 (Document 168).

5

(5:03 CV 1342)

## II. LAW

A.    RETIREE HEALTH BENEFITS

The Court has determined that Sixth Circuit law applies to this case in its entirety,

including plaintiffs from plants located outside of the Sixth Circuit.  *See* Document 155.   In this

case, plaintiffs do not claim that defendants have sought to terminate plaintiffs' retiree health

care benefits, but rather allege that defendants have increased the cost to plaintiffs for that health

care in violation of the applicable collective bargaining agreements.  The critical question is

whether the retiree health care benefits at issue are vested and cannot be unilaterally changed by

the employer.

1.    *Yard-Man* and its Progeny

Retiree health benefit plans, unlike pension plans, are not subject to mandatory vesting.

*Noe v. PolyOne Corp.,* 520 F.3d 548, 552 (6th Cir. 2008)(citing *Maurer v. Joy Tech., Inc.*, 212

F.3d 907, 914 (6th Cir. 2000)).  However, the Sixth Circuit in *UAW v. Yard-Man, Inc.*[13]

recognized that parties to collective bargaining agreements can agree to vest retiree health

insurance benefits, thereby creating benefits that survive termination of the agreement.

*Yard-Man* at 1479.  Vesting means that the benefits cannot be altered for the lifetime of the

beneficiary.[14]  *Sprague v. General Motors Corp.*, 133 F.3d 388, 400 (6th Cir. 1998)(en banc)("To

vest benefits is to render them forever unalterable.").  If retiree health insurance benefits are not

vested, however, then the employer may terminate or modify those benefits upon expiration of

---

[13] 716 F.2d 1476 (6th Cir. 1983).

[14] In some cases, the beneficiary is also the surviving spouse of the retiree.

6

(5:03 CV 1342)

the collective bargaining agreement that provided those benefits.  *Yolton v. El Paso Tennessee Pipeline Co.,* 435 F.3d 571, 578 (6th Cir. 2006).

The *Yard-Man* vesting analysis applies not only to situations in which the employer eliminates retiree health benefits entirely, but also to situations in which the benefits are diminished or limited by the employer.  *Cates v. Cooper Tire & Rubber Co.,* 555 F. Supp. 2d 878, 885, fn. 5 (N.D. Ohio 2008) ("The Sixth Circuit has affirmed that *Yard-Man* is not only appropriate where the employer terminates benefits, but also where an employer places additional limitations on previously vested benefits." (citing *Int'l Union v. Loral,* 1997 WL 49007, *1)).

When retiree benefits are vested, the beneficiary continues to receive the benefits in the collective bargaining agreement in effect when s/he retired for the life of the retiree and, in certain circumstances, for the life of the surviving spouse.  *Yolton* at 581 ("the retirement package available to someone contemplating retirement will change with the expiration and adoption of CBA's, but someone already retired under a particular CBA continues to receive the benefits provided therein despite the expiration of the agreement itself").  If this were not the case, retiree benefits "would be left to the contingencies of future negotiations." *Yard-Man* at 1482.

2.        Contract Interpretation of Intent to Vest

Whether retiree health insurance benefits are vested depends upon the intent of the parties.  *Yard-Man* and its progeny set out the guiding principles in the Sixth Circuit for

(5:03 CV 1342)

determining whether parties to collective bargaining agreements intended retiree health insurance benefits to vest.[15]

    In determining whether the parties to a collective bargaining agreement intended retiree health benefits to vest, the basic rules of contract interpretation apply.[16]  If a contract is clear and unambiguous, the parties' intent should be determined from the plain language of the contract and the Court should not use extrinsic evidence to discern intent.  *Cates v. Cooper Tire & Rubber Co.,* 555 F. Supp. 2d 878, 885, fn. 5 (citing *Royal Ins. Co. of. Amer. V. Orient Overseas Container Line, Ltd.,* 514 F.3d 621, 634 (6th Cir. 2008)).

    Therefore, the Court must first examine the language of the applicable collective bargaining agreement for clear manifestations of an intent to vest.  *Noe* at 552 (citing *Yard-Man* at 1479).  Each provision of the collective bargaining agreement is to be construed consistently with the entire agreement and the "relative positions and purposes of the parties."  *Id.* (internal citations omitted).  The terms of the collective bargaining agreement "should be interpreted so as to avoid illusory promises and superfluous provisions."  *Noe* at 552 (citing *Yard-Man* at 1480).

---

[15] The controversy as to whether *Yard-Man* created a presumption of vesting, shifted the burden of proof to the employer, or required specific anti-vesting language in order for a court to find that the parties did not intend benefits to vest has been clarified by subsequent Sixth Circuit decisions.  *Yolton v. El Paso Tennessee Pipeline Co.*, 571, 579 (6th Cir. 2006).  There is no legal presumption of vesting based on the status of retired employees.  *Id.* (quoting *Int'l Union, United Auto. Workers v. Cadillac Malleable Iron Co.*, 728 F.2d 807, 808 (6th Cir. 1984)).  Further, *Yard-Man* does not shift the burden of proof to the employer or require specific anti-vesting language in order for a court to find that the parties did not intend benefits to vest.  *Id.* (quoting *Golden v. Kelsey-Hayes Co.*, 73 F.3d 648, 656 (6th Cir. 1996)).  *Yard-Man* simply allows the Court to infer an intent to vest from the context and already sufficient evidence of an intent to vest.  *Id.*

[16] "The enforcement and interpretation of collective bargaining agreements under § 301 is governed by substantive federal law.  However, traditional rules for contractual interpretation are applied as long as their application is consistent with federal labor policies.  Many of the basic principles of contractual interpretation are fully appropriate for discerning the parties' intent in collective bargaining agreements."  *Maurer* at 914-915 (quoting *Yard-Man* at 1479-1480).

8

(5:03 CV 1342)

If there is an ambiguity regarding intent to vest in the language of the collective bargaining agreement, then the Court may look to extrinsic evidence to make that determination. *Noe* at 552 (citing *Int'l Union, United Auto. Aerospace & Agric. Implement Workers of Am. v. BVR Liquidating, Inc.*, 190 F.3d 768, 774 (6th Cir. 1999)). If the available extrinsic evidence is not conclusive and a question of intent to vest remains, then summary judgment is improper. *Noe* at 552 (citing *Int'l Union, United Mine Workers of Am. v. Apogee Coal Co.,* 330 F.3d 740, 744 (6th Cir. 2003)).

        3.      <u>Indicia of Intent to Vest</u>

The Court can find that retiree health insurance benefits are vested even if the parties have not specifically articulated an intent to vest in the collective bargaining agreement. *Yolton* at 578 (quoting *Maurer* at 915). Conversely, specific anti-vesting language is not required in order for the Court to find that the parties did not intend retiree health benefits to vest. Yolton at 579 (quoting *Golden* at 656); *BVR Liquidating* at 772.

The Sixth Circuit has identified a number of factors to consider in determining whether the parties intended to vest retiree health benefits:

        a.      Linkage of Retiree Health Benefits to Pension Eligibility

The Sixth Circuit has repeatedly held that "language in an agreement that ties eligibility for retiree health benefits to eligibility for a pension indicates an intent to vest the health benefits." *Noe* at 558 (internal citations omitted). Because retirees receive pension benefits for life, tying health insurance benefits to pension benefits demonstrates an intent to provide lifetime health benefits, as well. *Yolton* at 580 (quoting *Golden* at 656).

9

(5:03 CV 1342)

      b.      Durational Clauses

A general durational provision in a collective bargaining agreement does not preclude a finding that the parties intended retiree health benefits to vest.  In the Sixth Circuit, general durational language in a collective bargaining agreement applies only to the duration of the agreement and not the duration of the benefits created if the parties' intended the benefits to vest. *Cates* at 887 (citing *Maurer* at 917-918).

Absent durational language specifically referring to retiree benefits themselves, general durational language says nothing about the vesting of retiree benefits and does not resolve the vesting issue.  *Noe* at 555 (quoting *Yolton* at 581); *Cates* at 888.  However, the absence of specific durational language with respect to retiree health care benefits in agreements that contain specific durational language regarding other benefit provisions suggests an intent to vest retiree benefits.   *Noe* at 562-563 (citing *Yard-Man* at 1481-1482).

      c.      Surviving Spouse Benefits

Agreements which provide for surviving spouses to continue receiving retiree health benefits until the spouses' death or remarriage suggests an intent to vest those benefits.  If those benefits are not vested, the promise of benefits for spouses of deceased retirees is illusory. *Noe* at 562.

      4.      <u>Continuation of Benefits versus Cost of Benefits</u>

Although defendants contend that the issue in this case is not continuation of retiree health benefits but whether the parties intended the <u>cost</u> of plaintiffs' health benefits to vest, there is no real distinction between the vesting of retiree health benefits and the vesting of the

(5:03 CV 1342)

cost of those benefits.[17]  Vested benefits means that the level of benefits cannot be changed.

*Sprague v. General Motors Corp.*, 133 F.3d 388, 400 (6th Cir. 1998)(en banc)("To vest benefits

is to render them forever unalterable.").  If retiree health benefits are vested, those benefits

cannot be changed, including changes to the cost of those benefits.

A number of cases in the Sixth Circuit have dealt with modification of the cost, not

termination, of retiree health benefits.  *Noe v. PolyOne Corp,* 520 F.3d 548 (6th Cir. 2008)

(defendant ceased reimbursing plaintiffs' Medicare Part B premiums, required plaintiffs to

contribute to premiums, and instituted higher prescription co-pays); *Yolton v. El Paso Tennessee*

*Pipeline Co.,* 435 F.3d 571 (6th Cir. 2006)(increase cost of monthly contribution by retirees);

*Golden v. Kelsey-Hayes*, 73 F.3d 648 (6th Cir. 1996)(employer sought to increase cost of retiree

health benefits to retirees and surviving spouses); *Pringle v. Continental Tire North America,*

541 F.Supp. 2d 924 (N.D. Ohio 2007)(unilateral decrease of employer contribution caps to

retiree medical coverage).   In all of these cases, the courts applied the *Yard-Man* analysis to

determine the parties' intent to vest retiree health benefits.  Because the vesting of benefits

means that the benefits cannot be changed, the determination of the parties' intent to vest retiree

health benefits under the *Yard-Man* analysis is dispositive of the question of whether the cost of

those benefits can be modified.

---

[17]  Defendants cite *Sprague* in support of their argument that the issue in this case is not about lifetime benefits, but the cost of benefits.  However, in *Sprague*, plaintiffs' retiree benefits were not the subject of a collective bargaining agreement but were unilaterally instituted by the employer.  The non-bargained retiree benefits in *Sprague* were not vested.  Because the benefits were not vested, the employer in *Sprague* was free to amend the plan or terminate the benefits.

(5:03 CV 1342)

Therefore, the ultimate issue before the Court on summary judgment is whether there are genuine issues of material fact in dispute as to the parties' intent to vest retiree health benefits. The parties' intent to vest the <u>cost</u> of retiree health benefits is not a separate question from the parties' intent to vest the benefits.

B.     SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56 .  When considering a motion for summary judgment, "the inferences to be drawn from the underlying facts contained in [affidavits, pleadings, depositions, answers to interrogatories, and admissions] must be viewed in the light most favorable to the party opposing the motion."  *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).  However, the adverse party "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

The Rule requires the nonmoving party who has the burden of proof at trial to oppose a proper summary judgment motion "by any of the kinds of evidentiary material listed in Rule 56(c), except the mere pleadings themselves[.]" *Celotex Corp. V. Catrett*, 477 U.S. 317, 324 (1986).  General averments or conclusory allegations of an affidavit do not create specific fact disputes for summary judgment purposes.  *See Lujan v. National Wildlife Federation*, 497 U.S. 871, 888-89 (1990).  Nor may a party "create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts . . . earlier deposition testimony."  *Reid v. Sears Roebuck & Co.,* 790 F.2d 453, 460 (6th Cir. 1986) (citing *Biechell v. Cedar Point, Inc.,*

12

(5:03 CV 1342)

747 F.2d 209, 215 (6th Cir. 1984)); *but see Baer v. Chase*, 392 F.3d 609, 623-26 (3d Cir. 2004) (noting that a so-called "sham" affidavit need not be disregarded if there is "independent evidence in the record to bolster [the] otherwise questionable affidavit").  Further, "'[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.'" *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989) (quoting *Anderson v. Liberty Lobby*, 477 U.S. at 252).

In sum, "[t]he inquiry performed is the threshold inquiry of determining whether there is the need for a trial – whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby*, 477 U.S. at 250.  Put another way, this Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* At 251-52. *See also Wexler v. White's Fine Furniture, Inc.,* 317 F.3d 564, 578 (6th Cir. 2003) ("[t]he conflicting proof and the inferences that can be drawn therefrom raise genuine issues of material fact that preclude the grant of summary judgment").

### III.  ANALYSIS

A.    THE PARTIES' CROSS MOTIONS FOR SUMMARY JUDGMENT

In their cross motions for summary judgment, both plaintiffs and defendants claim that there are no material issues of fact in dispute as to whether plaintiffs are entitled to retiree health

13

(5:03 CV 1342)

benefits which cannot be unilaterally changed by the defendants.  However, their view of the facts lead to different conclusions.

       1.    <u>Plaintiffs' Motion for Summary Judgment</u>

Plaintiffs maintain that they are entitled to summary judgment on all claims in their fourth amended complaint not previously dismissed because the controlling collective bargaining agreements provide for lifetime vested health benefits under the LMRA and ERISA.  Plaintiffs assert that the agreements unambiguously provide vested lifetime health benefits because those benefits: 1) are tied to pension eligibility; 2) continue for surviving spouses; and 3) are not limited by specific durational language while other benefits are so limited.

Defendants oppose plaintiffs' motion on the grounds that the contract language does not support an intent to vest.  Further, defendants contend that the unions just "signed on" to the same benefits that were provided to non-union retirees.  As a result, defendants argue that union retirees gave no *quid pro quo* for those retirement benefits and are therefore not entitled to the *Yard-Man* inference accorded retiree benefits in traditional collective bargaining contexts. Additionally, defendants conclude that because the unions just "signed on" to the same plan as the non-union retirees, the defendants have the same right to change plaintiffs' retiree benefits as they have to change non-union retiree benefits.

14

(5:03 CV 1342)

Defendants maintain that "[t]here is nothing inconsistent in saying that one wishes or intends to continue a plan unchanged, even "for life," but also reserving the right to unilaterally change the cost of that plan in the future if economics require."  Document 178, p. 12.[18]

> Defendants . . . have never argued that these retiree benefits do not 'continue' past the expiration date of a CBA - rather, the significance of a CBA's expiration is that a union retiree's guarantee of a certain level of benefits ends after the collective bargaining agreement under which he retired ends.  But that is not "the end" of his benefits - rather, he remains part of the large retiree pool (union and nonunion) covered by the plan. . . . That plan is subject to being (and was) changed for all retirees (union or nonunion) unilaterally over the years (long before 2003), sometimes resulting in cost increases to retirees . . . but unless and until changes are made, it was intended to, did and does continue for all retirees (union or nonunion).  (Emphasis in original.)

Document 178, p. 6.

In conclusion, defendants maintain that plaintiffs cannot carry their burden of proving that the parties intended the cost of retiree benefits to vest.

> 2.      Defendants' Motion for Summary Judgment

The defendants' argument in support of their motion for summary judgment is heavily dependent on extrinsic evidence.  Similar to their opposition to plaintiffs' motion, defendants' motion for summary judgment focuses on "cost vesting."  Specifically, defendants argue that the language of the agreements, the genesis of retiree benefits, and a variety of other extrinsic evidence establishes beyond dispute that the parties did not intend to vest retiree health benefits and defeats any inference of "cost vesting."

---

[18] In support of this position, defendants cite *Sprague* at 401 ("We see no ambiguity in a summary plan description that tells participants both that the terms of the current plan entitle them to health insurance at no cost throughout retirement and that the terms of the current plan are subject to change.").

(5:03 CV 1342)

Plaintiffs counter in their opposition brief that defendants are not entitled to summary judgment because the collective bargaining agreements cannot be unambiguously construed to allow Morton to alter or terminate retiree health benefits, and because defendants' motion depends on extrinsic evidence to raise disputed issues of material fact.

B.     SUBCLASSES

The Court previously determined that the relevant language of the bargaining agreements in each subclass are virtually identical.   *See*, Document 155.

1.     Subclass A

Subclass A consists of "no premium retirees."  These retirees (or deceased retirees with surviving spouses) retired at a time when s/he was required to pay no premium benefits according to the collective bargaining agreement in effect at the time of retirement.  This class consists of the representatives and plant locations contained in the table below.

| Plaintiff | Plant Location | Union | Retirement Date |
|-----------|----------------|-------|-----------------|
| Laura Bialik | Manistee, MI | PACE Local 6-667 | 1/1/84 (spouse) |
| Donald McColman | Marysville, MI | USWA Local 12278 | 12/31/84 |
| Billy Smith, Jr. | Grand Saline, TX | ICWUC Local 3C | 9/30/86 |
| Martha Hall | Fairport Harbor, OH | PACE Local 5-966 | 11/1/86 (spouse) |
| Ross Satterfield | Fairport Harbor, OH | PACE Local 5-966 | 3/1/91 |
| Russell Crall | Rittman, OH | USWA Local 12081 | 1987 |

(5:03 CV 1342)

    2.    <u>Subclass B</u>

Subclass B consists of "fixed or percentage premium retirees."  These retirees (or deceased retirees with surviving spouses) retired at a time when s/he was required to pay a fixed monthly premium or pay 5% of the total cost of retiree health insurance according  to the collective bargaining agreement in effect at the time of retirement.  This class consists of the representatives and plant locations contained in the table below.

| Plaintiff | Plant Location | Union | Retirement Date |
|---|---|---|---|
| Thomas Alfieri | Silver Springs, NY | PACE Local 1-625 | 8/1/92 |
| James Williams | Grand Saline, TX | ICWUC Local 3C | 1/1/93 |
| Donald Robinson | Hutchinson, KS | USWA Local 12606 | 12/1/93 |
| Doris Dean | Rittman, OH | USWA Local 12081 | ? |
| Ernest Jeaminette | Weeks Island, LA | ICWUC Local 29C | 1/1/94 |

    3.    <u>Subclass C</u>

Subclass C consists of "capped retirees."  These retirees (or deceased retirees with surviving spouses) retired at a time when s/he was subject to a cap of Morton's contributions to retiree health insurance according  to the collective bargaining agreement in effect at the time of retirement.  This class consists of the representatives and plant locations contained in the table below.

| Plaintiff | Plant Location | Union | Retirement Date |
|---|---|---|---|
| Charles Henderson | Weeks Island, LA | ICWUC Local 29C | 1/1/99 |

(5:03 CV 1342)

| Bart Kochis | Fairport Harbor, OH | PACE Local 5-966 | 5/1/00 |
| Donald Cook, Sr. | Hutchinson, KS | USWA Local 12606 | 2/2/02 |
| Moses Moore | Rittman, OH | USWA Local 12081 | 6/1/02 |

D.    VESTING ANALYSIS

The Court will first examine the subclass agreements to determine if the language is clear and unambiguous regarding vesting. If it is, the parties' intent regarding vesting will be determined from the plain language of the contract as an integrated whole, construing each provision consistently with the entire agreement and interpreting the language to avoid illusory promises. If ambiguities in the contract language exist after applying this analysis, then the Court will consider extrinsic evidence. If after this analysis there are genuine issues of material fact in dispute as to the parties' intent to vest retirement health benefits, then summary judgment is not appropriate.

1.    Linkage of Retiree Health Benefits to Pension Eligibility

The Sixth Circuit has repeatedly held that "language in an agreement that ties <u>eligibility</u> for retiree health benefits to <u>eligibility</u> for a pension indicates an intent to vest the health benefits." *Noe* at 558 (emphasis added) (citing *McCoy v. Meridian Auto, Inc.,* 390 F.3d 417, 422 (6th Cir. 2004)). Because retirees receive pension benefits for life, tying health insurance benefits to pension benefits demonstrates an intent to provide lifetime health benefits, as well. *Yolton* at 580 (quoting *Golden* at 656).

18

(5:03 CV 1342)

The Court has examined the collective bargaining agreements at issue in this case.[19]

The agreements unambiguously tie <u>eligibility</u> for retiree health benefits to retirement under the

provisions of Morton's pension plan.  For example, in Subclass A, the Rittman, Ohio agreement

provides that:

> Section 13.4.   Health Care Insurance providing hospital, medical, surgical, and dental benefits . . . will be provided for all full time regular employees of the Company, after their original qualifying period, at no cost to the employee.  **Such insurance shall be continued for such employees upon their retirement under the Mortion-Thiokol Pension Plan for Hourly Paid Employees.**[20]  (Emphasis added.)

In Subclass B, the Silver Springs, New York agreement provides that:

> **Section 8.1(g).  Employees retiring under the provisions of the Morton International, Inc. pension plan . . . may enroll themselves and eligible dependents in the Company's Health Care Plan for retirees.**[21]  (Emphasis added.)

In Subclass C, the Hutchinson, Kansas agreement provides that:

> Section 8.1(H).  **Employees retiring under the [provisions] of the Morton International, Inc Pension Plan . . . may enroll themselves and eligible dependents in the Company's Health Care Plan for Retirees.**[22]  (Emphasis added.)

Defendants do not dispute that the agreements link eligibility for retirement health

benefits to retirement under the pension plan.  However, defendants argue that the linking

---

[19] Document 171.

[20] Document 171, Exhibit 1.  The Court has previously determined that the agreement language within subclasses is identical or very nearly identical.

[21] Document 171, Exhibit 20.

[22] Document 171, Exhibit 6.

19

(5:03 CV 1342)

language does not <u>directly</u> connect the <u>cost</u> of the benefit to pension eligibility, and therefore does not provide an inference that the parties intended to vest the cost of those benefits.[23]

This argument is a continuation of defendants' reasoning that vesting of lifetime health care and vesting of the cost of the lifetime health care are two different concepts.  In the Sixth Circuit, vesting means that the benefits are unalterable, including the cost of those benefits. If the benefits may be amended by the employer, then the benefits are not vested.

Linkage of eligibility for health care benefits to retirement under the employer's pension plan indicates the parties' intent to vest those benefits.[24]  The Court finds that the agreements' linkage of retiree health benefits to retirement under Morton's pension plan is an indication that the parties' intended these benefits to vest.

    2.    <u>Durational Limits</u>

In the Sixth Circuit, general durational language in a collective bargaining agreement applies only to the duration of the agreement and not the duration of the benefits created if the parties' intended the benefits to vest.   *Cates* at 887 (citing *Maurer* at 917-918).  The absence of specific durational language with respect to retiree health care benefits, in agreements which

---

[23] Document 178, pp. 14-16.

[24] Although the Court is not persuaded by defendants' argument that lifetime benefit vesting and cost vesting are two separate analysis, the Court observes that cost language in the agreements at issue in this case, if not in the same sentence as the pension language, is in direct proximity to the pension language.  For example in Subclass A, the agreement language applicable to plaintiff Crall at the Rittman, Ohio facility provides that:
> Section 13.4.   Health Care Insurance providing hospital, medical, surgical, and dental benefits . . . **will be provided for all full time regular employees of the Company, after their original qualifying period, at no cost to the employee.  Such insurance shall be continued for such employees upon their retirement under the Mortion-Thiokol Pension Plan for Hourly Paid Employees.** (Emphasis added.) *See* Document 171, Exhibit 1.

(5:03 CV 1342)

contain specific durational language for other types of benefits, indicates an intent to vest retiree

health benefits.   *Noe* at 562-563 (citing *Yard-Man* at 1481-1482).

Plaintiffs point out grids or charts in the bargaining agreements which identify for

different groups of employees the maximum period of continuation for various types of

insurance.  In the Rittman agreements before 1992, those charts are identified as Exhibit C, and

identify 5 employee groups[25] and 4 forms of insurance.[26]  Exhibit C identifies specific durational

limits for all of the forms of insurance and employee groups <u>except</u> for health insurance coverage

for employees retired on a pension.   For retiree health insurance, Exhibit C simply indicates

"Continued."  For Rittman agreements after 1992, Exhibit C also contains no specific durational

limit for retiree health benefits - Exhibit C simply indicates "Retiree Benefits [are] Continued at

the Employee's Option." [27]  The Hutchinson, Kansas agreements similarly do not contain

specific durational limits for retiree health benefits, but refer the reader back to the language of

the agreement,[28] as does the Marysville, Michigan agreements,[29] Fairport Harbor, Ohio

---

[25] 1) Disabled employees under workmen's compensation; 2) Employees disabled due to illness or injury not connected with employment; 3) Employees on a leave of absence for personal reasons; 4) Employees laid off; and 5) Employees retired on pension.

[26] 1) Life insurance; 2) Accidental death and dismemberment insurance; 3) Accident and Health; and 4) Health Care and Dental Insurance Including Dependent Coverage.

[27] *See* Document 165, Exhibit A.

[28]  *See* Document 165, Exhibit B.

[29]  *See* Document 165, Exhibit C.

21

(5:03 CV 1342)

agreements,[30] and Silver Springs, New York agreements.[31]  The Grand Saline, Texas[32] and Weeks Island, Louisiana[33] agreements similarly do not contain specific durational limits for retiree health benefits, but variously provide that retiree health benefits are "continued" or "continued at the employee's option."  Lastly, the Manistee, Michigan agreements[34] also do not contain specific durational limits for retiree health benefits, but variously state that retiree health benefits are "continued on the same basis as active employees coordinated with Medicare."

       3.     <u>Reservation of Rights</u>

Defendants do not contest that retiree health benefits as set forth in the various 'grids' appearing in the collective bargaining agreements provide for "continued" retiree health care. Rather, defendants argue that the continuation of retiree health benefits beyond the expiration of the collective bargaining agreements is not the issue - but that the issue is whether the cost of those benefits could be changed after retirement.   Defendants assert that the cost issue is addressed by the collective bargaining agreements' benefits booklets and the summary plan descriptions' reservation of rights clauses.

Summary plan documents are extrinsic evidence regarding the parties intent to vest. *Prater v. Ohio Education Association*, 505 F.3d 437, 445 (6th Cir.  2007)(citing *Yard-Man* at

---

[30]  *See* Document 165, Exhibit D.

[31]  *See* Document 165, Exhibit F.

[32]  *See* Document 165, Exhibit G.

[33]  *See* Document 165, Exhibit H.

[34]  *See* Document 165, Exhibit E.

22

(5:03 CV 1342)

1481-1482).  Summary plan descriptions cannot be interpreted to vitiate contractually vested or

bargained for rights.  *Prater* at 444-445.

The reservation of rights clauses in the Morton benefits books and summary plan

descriptions appear to reserve to Morton the right to modify eligibility, change, suspend or

terminate plan benefits "except as limited by the provisions of any applicable bargaining

agreement, laws or regulations."[35]  However, the interpretation of the reservation of rights clause

depends on the interpretation of the collective bargaining agreement as to vesting.  *Yolton* at 582

(where collective bargaining creates vested lifetime benefits, reservation of rights language

limited by the provisions of applicable collective bargaining agreements does not reserve to

employer the right to modify those benefits).  Because the reservation language is limited by the

provisions of the applicable bargaining agreement, it is not inconsistent with vesting and does

not reserve to defendants the right to modify those benefits if the Court finds the benefits are

vested.

New summary plan descriptions were issued to retirees in 1998.  These documents do not

limit the defendants' reservation of rights language to the provisions of the collective bargaining

agreement and defendants assert that this reservation language demonstrates that the parties did

not intend to vest the cost of retiree health benefits.  However, this reservation of rights language

does not contain the sweeping reservation language of *Maurer* which allowed the employer to

---

[35] For example, *see* Document 173, Exhibit 25.  Defendants offer extrinsic evidence they have previously
modified retiree health benefits in connection with the Fairport Harbor Strike, demonstrating that the reservation of
rights clause does not limit their ability to modify retiree health costs subject to applicable collective bargaining
agreements.  But even if retirees tolerated modifications to health benefits in the past, they are not barred from now
claiming that those benefits are vested.  *Reese v. CNH Global,* 2007 WL 2484989 (E.D. Mich.) at * 6 (citations
omitted).

23

(5:03 CV 1342)

terminate medical coverage already being provided to retirees for existing illnesses.

Accordingly, the Court finds that the 1998 reservation of rights language does not constitute an

"unqualified reservation-of-rights"[36] and that this extrinsic evidence is insufficient to vitiate an

intent to vest evinced by the unambiguous language of the agreements.

     4.    <u>Surviving Spouse Language</u>

In Subclass A, agreements from the following facilities contain provisions that provide

for continued health care to surviving spouses for the remainder of their lives: Rittman, Ohio;

Marysville, Michigan; Fairport Harbor, Ohio; Manistee, Michigan; and Grand Saline, Texas.[37]

The provision of benefits to surviving spouses for life indicates the parties' intent to vest those

benefits.  Subclass B and C agreements provide that eligible dependents may be enrolled in the

retiree health plan but do not provide for lifetime surviving spouse benefits.

E.    S<small>UBCLASS</small> C

Subclass C plaintiffs' claims involve not only a question of vesting, but also the question

of the parties' intent as to whether defendants must credit their entire Medicare D subsidy to

reduce the "actual cost" of retiree medical insurance.  The collective bargaining agreements for

Subclass C plaintiffs provide that the parties' relative obligations for the cost of retiree health

care are based on the "actual cost of retiree medical insurance" and place a cap on defendants'

contribution to those costs.

> To determine the retiree payment for 1/1/94, the calendar year 1993 will be used
> in the calculations.  For calendar year 1993, the monthly payments required from retirees

---

[36] *Prater* at 444 (quoting *McCoy* at 424).

[37] *See* Document 165, Exhibits A, C, D, E, and G.

(5:03 CV 1342)

> . . . will be $18 for single coverage and $33 for family coverage.
>
> The $18 and $33 payments . . . will be subtracted from **the actual cost of retiree medical insurance** during the 12 month period ending September 30, 1992 and the resulting figure will be designated as the "company contribution." **In 1994 and subsequent years that "company contribution" will be increased by no more than 4% and the difference between that amount and the actual cost of retiree medical insurance** during the 12 months ending the preceding September 30th will be the required retiree contribution . . . for that particular year.[38] (Emphasis added.)

Subsequently, the parties negotiated a "hard cap."  This language provides that:

> Effective for calendar year 2000 and subsequent years, the **"Company contribution" shall be fixed at the amount contributed by the Company in calendar year 1999 and the difference between such amount and the actual cost of retiree medical insurance . . . will be the required retiree contribution . . .**[39]    (Emphasis added.)

After the hard cap was implemented, only the plaintiffs' contribution to the cost of retiree medical care was affected by the actual cost of their health care.

The plaintiffs' Subclass C claims regarding the Medicare D subsidy is "a simple matter of contract interpretation."[40]  The Court's analysis of the bargaining agreement language regarding the "actual cost of retiree medical insurance" and the Medicare D subsidy, like the Court's analysis of the parties' intent to vest, begins with the contract language without consideration of extrinsic evidence.

Subclass C plaintiffs contend that their unions bargained for a pass-through of savings to defendants in the "actual cost" of their medical coverage, and that the Medicare D subsidy reduces the cost of health care insurance and therefore should be applied to reduce the "actual

---

[38] 1992-1995 Rittman, Ohio collective bargaining agreement (Document 173-2, Exhibit 27).

[39]  1995-1998 Rittman, Ohio collective bargaining agreement (Document 171-2, Exhibit 3).

[40] Plaintiffs' Brief in Opposition to Defendants' Motion for Summary Judgment, Document 175, p. 23 of 27.

(5:03 CV 1342)

cost" of insurance under the collective bargaining agreements.  However, such a pass-through provision is material and the agreements contain no such language.

Defendants refute plaintiffs' contractual right to application of the Medicare D subsidy to reduce the "actual cost of retire medical insurance" on multiple grounds.  First, defendants point out that the Medicare D program is an employer incentive program and no provision of the act requires sharing of the subsidy.  Second, defendants assert that they are fully satisfying their contractual obligations beginning in 2000 for payment of a "fixed cap."  Third, defendants argue that the actual cost of retiree medical insurance is unrelated to the Medicare D subsidy.

In support of their argument for summary judgment on this issue, plaintiffs' contend that "actual cost" means defendants' "net out-of-pocket cost for insurance" and cite a number of cases outside of the collective bargaining context in which "actual" costs, charges or prices include adjustments for refunds, rebates, allowances, credits, etc.  However, these cases are not on point.  The contract language reads "actual cost of retiree medical insurance."  The Medicare D subsidy is not a rebate, credit or refund.  It does not affect or change Morton's "actual cost of retiree medical insurance."

This interpretation is consistent with the purpose of the subsidy, as noted by plaintiffs, to encourage employers to maintain retiree drug coverage programs.  Passing the monetary benefit of the subsidy onto plaintiffs in order to reduce the health care costs that plaintiffs pay does nothing to reduce the actual cost of retiree medical insurance or achieve the subsidy's intended effect of assisting employers in maintaining prescription drug coverage for their employees.

26

(5:03 CV 1342)

Although plaintiffs argue that they negotiated a pass-through of savings by defendants to reduce the "actual cost" of retiree health insurance, the contract language does not reflect such an agreement.  The plain language of the agreements regarding "actual cost of retiree medical insurance" on its face does not provide for subtraction of the Medicare D subsidy from defendants' "actual cost" of insurance for retirees.  Therefore, the Court finds that defendants are not required to reduce the "actual cost" or retire medical insurance by the amount of their Medicare D subsidy.

F.      THE COLLECTIVE BARGAINING AGREEMENTS INDICATE AN INTENT TO VEST

As previously noted, the vesting of the cost of retiree health benefits is not a separate question from the vesting of retiree health benefits.  The Court finds that the plain language of the bargaining agreements in this case indicates that the parties intended retiree health benefits to vest.

First, in the agreements for all subclasses, eligibility for retiree health benefits is expressly linked to retirement under the pension plan.  The Sixth Circuit has repeatedly held that such linkage evinces an intent to vest.  *Noe* at 553 and 559 ("tying eligibility for retiree health benefits to eligibility for a pension . . . in and of itself suggests an intent to vest").

Second, while the agreements contain specific durational limits for certain employee groups and insurance coverage, no such specific durational language is applied to retiree health benefits.  In fact, the durational language for retiree health benefits provides that the benefits are "continued."   This is another indication of the parties' intent to vest retiree health benefits.

27

(5:03 CV 1342)

These two factors alone form a sufficient basis under Sixth Circuit law to find that the language of the bargaining agreements clearly manifests the parties' intent to vest retiree health benefits.[41]  In addition, the Subclass A bargaining agreements provide for the continuation of retiree health benefits for surviving spouses.  A finding that retiree health benefits are not vested would render the surviving spouse provision illusory.

The plain language of the agreements support a finding that there is no genuine issue of material fact in dispute that the parties intended to vest retiree health benefits.  Consequently, the Court need not examine the extrinsic evidence presented by the parties in support of their motions.  The Court's finding that the retiree health benefits are vested means that they are unalterable and that the cost of those benefits to retirees cannot be modified.   However, the monetary damages resulting from Morton's violation of plaintiffs' vested retiree health benefits will necessarily be fact intensive and cannot be decided on summary judgment.

## IV.  CONCLUSION

For the reasons discussed above, plaintiffs' motion for summary judgment (Document 169) with respect to Subclass A and B plaintiffs is granted as to liability and denied as to damages.  Plaintiffs' motion for summary judgment (Document 169) with respect to Subclass C plaintiffs is: a) granted to the extent that Subclass C plaintiffs are vested in their retiree health benefits; b) denied to the extent that defendants violated the applicable collective bargaining

---

[41] As discussed above, the extrinsic evidence of defendants' reservation of rights clause does not change the outcome of this analysis under Sixth Circuit law.

(5:03 CV 1342)

agreements since 2006 by not reducing the "actual cost of retiree medical insurance" by the full amount of defendants' Medicare D subsidy; and c) denied as to damages.

For the reasons discussed above, defendants' motion for summary judgment (Document 162) with respect to Subclass A and B plaintiffs is denied.  Defendants' motion for summary judgment (Document 162) with respect to Subclass C plaintiffs is: a) denied to the extent that Subclass C plaintiffs are not vested in their retiree health benefits; b) granted to the extent that defendants did not violate the applicable collective bargaining agreements since 2006 by not reducing the "actual cost of retiree medical insurance" by the full amount of defendants' Medicare D subsidy; and c) denied as to damages.

Also before the Court is defendants' motion to strike a portion of plaintiffs' reply brief in support of their motion for summary judgment (Document 182), and plaintiffs' response to defendants' motion to strike (Document 183).  Because the Court's ruling on the Subclass C plaintiffs' claim regarding the Medicare D subsidy was based on the contract language, defendants's motion to strike (Document 182) is denied as moot.

The Court will conduct a status conference in this case on October 27, 2008, at 11:30 a.m.  At that time, the Court will inquire of defendants if there is any reason that the Court should not put on an Order requiring defendants to perform their statutory obligations under the retiree health benefits' plan and labor agreements consistent with this Memorandum Opinion.

29

(5:03 CV 1342)

In addition, the parties should be prepared to discuss what discovery, if any, is necessary regarding damages.


IT IS SO ORDERED.

 September 30, 2008                              s/ David D. Dowd, Jr.
Date                                       David D. Dowd, Jr.
                                           U.S. District Judge

30